**Slip Op. 17-11**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| SHANDONG RONGXIN IMPORT & EXPORT CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>DIXON TICONDEROGA COMPANY,<br><br>Defendant-Intervenor. | Before: Gary S. Katzmann, Judge<br><br>Court No. 15-00151<br><br>**PUBLIC VERSION** |

**OPINION AND ORDER**

[Commerce's Results of Redetermination Pursuant to Court Remand are sustained in part and remanded in part. Plaintiff's Motion for Judgment on the Agency Record is denied in part.]

Dated: February 3, 2017

John J. Kenkel, deKieffer & Horgan, PLLC, of Washington, DC, argued for plaintiff. With him on the brief were J. Kevin Horgan and Judith Holdsworth.

Robert M. Norway, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Erica A. Hixon, Trial Counsel. Of counsel on the brief was Amanda T. Lee, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC. Of counsel on the Supplemental Authority was Emily R. Beline, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Felicia Leborgne Nowels, Akerman LLP, of Tallahassee, FL, argued for defendant-intervenor. With her on the brief was Sheryl D. Rosen.

Katzmann, Judge: This is a case about pencils. It is also a case about judicial review of administrative action, the use of social media in agency proceedings, and trade relief in the form of duties that are imposed by law on imports that are sold in the United States at less than fair value ("dumped") and materially harm American industry or threaten it with material harm. Plaintiff, Shandong Rongxin Import & Export Co., Ltd. ("Rongxin"), an exporter of pencils from the People's Republic of China ("PRC") brought this action against Defendant, the United States, on May 22, 2015, disputing certain aspects of the final administrative review results issued by the U.S. Department of Commerce in Certain Cased Pencils from the People's Republic of China, 80 Fed. Reg. 26,897 (Dep't Commerce May 11, 2015) (final results of antidumping duty administrative review, 2012–2013) ("Final Results"); Issues and Decision Memorandum for Certain Cased Pencils from the People's Republic of China, A-570-827 at 2 (Apr. 30, 2015) ("IDM"); Pl.'s Conf. Mot. for J. upon Agency R., Aug. 28, 2015, ECF No. 24 ("Pl.'s Br."). Defendant and Defendant-Intervenor, Dixon Ticonderoga Company ("Dixon"), oppose Rongxin's Motion. Def.'s Conf. Opp'n., Dec. 18, 2015, ECF No. 30. ("Def.'s Br."); Def.-Inter.'s Opp'n, Dec. 18, 2015, ECF No. 34 ("Def. Interv.'s Br."). Rongxin argues that Commerce was not authorized to reopen the record on remand, and that it erred in finding that Dixon is a producer of domestic like product possessing interested party status with standing to request an administrative review. Rongxin also argues that it has shown it is not subject to PRC control and is entitled to an antidumping duty rate separate from the PRC-wide rate assessed by Commerce on companies in nonmarket economy ("NME") countries.[1] Dixon is an American corporation alleging, under

[1] "The term 'nonmarket economy country' means any foreign country that the administering (footnote continued)

Section 771(9)(C) of the Tariff Act of 1930, as amended ("Act"), 19 U.S.C. § 1677(9)(C) (2012),[2] interested party status as a producer of domestic like product to request administrative review of Rongxin, a foreign exporter. For the reasons set forth below, the court denies in part Rongxin's motion for judgment on the agency record and sustains Commerce's Results of Redetermination Pursuant to Court Remand finding that Dixon is a domestic producer and interested party, and thus has standing to request an administrative review; the court remands for further proceedings consistent with this opinion regarding whether Rongxin is entitled to a separate rate.

**BACKGROUND**

Commerce is required to impose antidumping duties on foreign goods that are being or are likely to be sold in the United States at less than fair value. 19 U.S.C. § 1673(1); Micron Tech. Inc. v. United States, 243 F.3d 1301, 1303 (Fed. Cir. 2001). Administrative reviews of antidumping duties are conducted in accordance with 19 U.S.C. § 1675. On December 21, 1994, the U.S. International Trade Commission ("ITC") published its determination that an industry in the United States is materially injured or threatened with material injury by reason of imports from the PRC of certain cased pencils that Commerce had determined to be sold in the United States at less than fair value. Certain Cased Pencils from the People's Republic of China, USITC Pub. 2837, Inv. No. 731-TA-669, 59 Fed. Reg. 65,788 (Dec. 21, 1994) (final determination). On

authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A) (2012).

[2] Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2012 edition, and all applicable amendments thereto, unless otherwise noted.

December 28, 1994, Commerce published the antidumping duty order covering certain cased pencils from China. Certain Cased Pencils from the People's Republic of China, 59 Fed. Reg. 66,909 (Dep't Commerce Dec. 28, 1994) (final results of antidumping duty order) ("Cased Pencils/China").

On December 3, 2013, during the anniversary month of the Cased Pencils/China antidumping duty order, Commerce notified interested parties of their opportunity to request an administrative review of the order in accordance with 19 C.F.R. § 351.213 (2013). Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 78 Fed. Reg. 72,636 (Dep't Commerce Dec. 3, 2013) (notice of opportunity to request administrative review).

On December 20, 2013, Dixon filed a request for administrative review of Rongxin. Req. for Administrative Review, PR 1 (Dec. 20, 2013). Dixon's request stated that "[a]s a United States importer and manufacturer of subject merchandise, Petitioner is an interested party under 19 U.S.C. § 1677(9) who may make this request for administrative review pursuant to 19 C.F.R. § 351.213(b)."[3] Id. at 1. The request was accompanied by a company certification, signed by Dixon's Chief Executive Officer ("CEO"), Timothy Gomez, which stated that the information contained in the submission is accurate. Id. at 3.

In accordance with its Articles of Association, Rongxin is a corporation owned by eleven shareholders and directed by a six-member board. Revised Rongxin Articles of Association, PR 40 (Oct. 16, 2014) ("Articles"); Rongxin's Section A Response Ex. A-2 Shareholders. Slightly

[3] The actual basis upon which Dixon sought to establish interested party status during the administrative proceedings here was as a manufacturer and producer in the United States of domestic like product.

more than a majority of Rongxin[4] is owned by Shandong International Trade Group ("SITG"), which in turn is wholly-owned by the State-Owned Assets Supervision and Administration Commission ("SASAC").[5] Rongxin's Section A Questionnaire Response at 2, PR 22–26, CR 23–24 (Apr. 3, 2015). The remainder[6] of Rongxin is owned by ten Rongxin employees. Id.

On February 3, 2014, Commerce initiated an administrative review of Rongxin. The Period of Review ("POR") covered by the administrative review is December 1, 2012, through November 30, 2013. IDM at 1.

During the administrative review, Rongxin argued that, first, Rongxin deserves a separate rate because it can demonstrate the absence of government control both in law (de jure) and in fact (de facto), and second, Commerce should rescind the initiation of the administrative review because there is no evidence on the record that Dixon is a U.S. manufacturer entitled to request a review. Rongxin's Case Brief, PR 48; CR 27 (Feb. 2, 2015).

The Department issued a Section A Questionnaire to Rongxin on February 28, 2014. Rongxin's Section A Questionnaire Response, PR 22–26; CR 4–15 (Apr. 3, 2015). Rongxin submitted its Section A response on April 3, 2014. Id. Commerce issued a First Supplemental Section A Questionnaire to Rongxin on September 18, 2014. DOC Supplemental Section A Questionnaire, PR 37; CR 22 (Sep. 18, 2014). Rongxin submitted its response to the First

---

4 [[ ]]

5 Plaintiff has disclosed SITG's majority ownership of Rongxin, as well as SITG's whole ownership by SASAC. See Pl.'s Br. at 4 (mentioning "SITG (the government-owned company which owns a small majority of Rongxin")).

6 [[ ]]

Supplemental Section A Questionnaire on October 16, 2014.  Rongxin First Suppl. Questionnaire

Resp. CR 23–24 at 4 (Oct. 16, 2014) ("Questionnaire Resp.").    Commerce published its

Preliminary Results on December 31, 2014, having determined that Rongxin is not eligible for a

separate rate.  Certain Cased Pencils from the People's Republic of China:  Preliminary Results of

Antidumping Duty Administrative Review and Partial Rescission; 2012-2013, 79 Fed. Reg.

78,795 (Dep't. Commerce Dec. 31, 2014) (preliminary determination).  Rongxin filed its Case

Brief on February 2, 2015.  Rongxin's Case Brief, PR 48; CR 27 (Feb. 2, 2015).  Dixon filed its

Rebuttal Brief on February 4, 2015.  Dixon's Rebuttal Brief, PR 49; CR 28 (Feb. 4, 2015).

Commerce published the Final Results of its administrative review on May 11, 2015.  In

the Final Results, Commerce found that there was no evidence "on the record that undermines or

calls into question Dixon's certification [that it is an interested party]."  IDM at 9.  As to the

question of whether Rongxin deserves a separate rate, Commerce found that evidence provided by

Rongxin demonstrated an absence of de jure government control.  Id. at 7.  Commerce continued

to find that Rongxin had not demonstrated an absence of de facto government control.  Id. at 8.

This matter came before Judge Tsoucalas on Rongxin's Rule 56.2 Motion for Judgment on

the Agency Record.  Pl.'s Br.  In Shandong Rongxin Import & Export Co., Ltd., v. United States,

40 CIT ____, ____, 163 F. Supp. 3d 1249, 1254–55 (2016) ("Remand Order"), the court remanded

this case for further explanation or reconsideration as may be appropriate with regard to the issue

of whether Dixon is an interested party with standing to request an administrative review of

Rongxin.  The court declined to reach the issue of whether Rongxin deserves a separate rate until

the threshold issue of standing was resolved.  Id. at 1254.

To resolve the issue on remand, Commerce issued two supplemental questionnaires to Dixon, the first on April 8, 2016.  Commerce's Supplemental Questionnaire, PR 1 (Apr. 8, 2016). Dixon submitted its response on April 18, 2016.   Dixon's Response to Supplemental Questionnaire, PR 7 (Apr. 18, 2016).  Rongxin filed rebuttal comments.  Rongxin's Rebuttal Comments on Dixon's Response to Supplemental Questionnaire, PR 10–13 (Apr. 22, 2016). Commerce issued a Second Supplemental Questionnaire to Dixon on April 28, 2016.  Commerce's Second Supplemental Questionnaire, PR 19 (Apr. 28, 2016).  Dixon submitted its response the next day.  Dixon's Response to Second Supplemental Questionnaire, CR 21–25 (Apr. 29, 2016). Rongxin again filed rebuttal comments.  Rongxin's Rebuttal Comments on Dixon's Response to Second Supplemental Questionnaire, PR 27 (May 6, 2016).

Commerce filed its remand results on June 17, 2016.  Final Results of Redetermination Pursuant to Court Remand, ECF No. 50 ("Remand Results").  Commerce continued to find that Dixon is a producer of domestic like product and, as such, is an interested party with standing to request an administrative review.  Id. at 1.  Dixon and Rongxin filed comments on June 19, 2016. Pl.'s Comments, July 19, 2016, ECF No. 56 ("Rongxin Comments"); Def.-Interv. Comments, July 19, 2016, ECF No. 53 ("Dixon Comments").  The United States filed its response on August 18, 2016.  Def.'s Resp., Aug. 18, 2016, ECF No. 59.  On September 21, 2016, following the retirement of Judge Tsoucalas, the Chief Judge reassigned the case to a different Judge.   Order of Reassignment, Sept. 20, 2016, ECF No. 62.

**JURISDICTION AND STANDARD OF REVIEW**

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) (2012), and 19 U.S.C. § 1516a(a)(2)(A)(i)(I).

The Court will sustain Commerce's antidumping determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States, 701 F.3d 1367, 1374 (Fed. Cir. 2012). Where Commerce's methodology is questioned for its accordance with law, "Commerce's decision will be set aside if it is arbitrary and capricious." Id. Both prongs of review are relevant to the instant case. We take note of each in turn, setting forth first the standard of substantial evidence.

(a). "The specific factual findings on which [Commerce] relies in applying its interpretation are conclusive unless unsupported by substantial evidence." United States v. Eurodif S.A., 555 U.S. 305, 316 n.6 (2009). Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003). "'[S]ubstantial evidence' must be measured by a review of the record as a whole, 'including whatever fairly detracts from the substantiality of the evidence.'" Juancheng Kangtai Chem. Co., Ltd. v. United States, 39 CIT ____, ____, Slip Op. 15-93 (Aug. 21, 2015) (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). "Moreover, any determination as to the substantiality of the evidence 'must take into account whatever in the

record fairly detracts from its weight,' including 'contradictory evidence or evidence from which conflicting inferences could be drawn.'" Nan Ya Plastics Corp., Ltd. v. United States, 39 CIT ____, ____, 128 F. Supp. 3d 1345, 1355 (2015) (quoting Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994)).

However, "the fact that a plaintiff can point to evidence that detracts from the agency's conclusion or that there is a possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence." ABB Inc. v. United States, 190 F. Supp. 3d 1159, 1166–67 (2016) (citing Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)). "The court may not 'reweigh the evidence or . . . reconsider questions of fact anew.'" Id. (quoting Downhole Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1377 (Fed. Cir. 2015)).

(b). To determine whether Commerce's interpretation and application of the statute is in accordance with law, the Court asks whether "Congress has directly spoken to the precise question at issue."[7] Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984). If the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question then becomes what level of deference is owed Commerce's interpretation, the traditional second prong of the Chevron analysis. Id. at 842–43; see United States v. Mead Corp., 533 U.S. 218, 228 (2001). "Chevron requires us to defer to the agency's interpretation of its own statute as

[7] "In order to determine whether a statute clearly shows the intent of Congress in a Chevron step one analysis, we employ traditional tools of statutory construction and examine 'the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'" Heino v. Shinseki, 683 F.3d 1372, 1378 (Fed. Cir. 2012) (quoting Delverde, SrL v. United States, 202 F.3d 1360, 1363 (Fed. Cir. 2000)).

long as that interpretation is reasonable." Koyo Seiko Co., Ltd. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994); see Kyocera Solar, Inc. v. United States Int'l Trade Comm'n, 844 F.3d 1334 (Fed. Cir. 2016).

"[A]n agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." Changzhou Wujin Fine Chem. Factory Co., Ltd., 701 F.3d at 1377 (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 284 (1974)). While "the substantial evidence standard applies to review of factual determinations[,]" where "we are evaluating the agency's reasoning . . . [we] review[] under the arbitrary and capricious (or contrary to law) standard." Id. (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983)); see Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (2012) (directing that the Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). "[W]here the agency is vested with discretion to set the procedure by which it administers its governing statute, the court reviews such decisions for abuse of discretion. . . . In abuse of discretion review, 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'" Jiangsu Jiasheng Photovoltaic Tech. v. United States, 38 CIT ____, ____, 28 F. Supp. 3d 1317, 1323 (2014) (quoting SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001)).

## DISCUSSION

### I.        Dixon is an Interested Party

### A.  Commerce was Authorized to Reopen the Record on Remand

Rongxin argues that Commerce lacked the authority to reopen the record on remand without specific direction from the court, which was not given.  Rongxin Comments at 11.  This argument flows from the proposition that "constant reopening and supplementation of the record would lead to inefficiency and delay in finality."  Rongxin's Comments on Draft Remand Results at 12, CR 27 (June 3, 2016) (citing Essar Steel Ltd. v. United States, 678 F.3d 1268, 1277 (Fed. Cir. 2012)).  Rather, Rongxin asserts, Commerce could have requested, or the court could have ordered, that the record be reopened, and even then, the court could only reopen it where "the original record was tainted by fraud," or the agency decision was "based on inaccurate data."  Id. at 12–13.  Rongxin thus requests that Dixon's proffered evidence on remand be excised from the record and not considered.  Rongxin Comments at 11.

Rongxin misreads Essar Steel and the prevailing law.  The Court may remand with instructions for Commerce to decide whether to reopen and supplement the record, in order to obtain necessary information or resolve ambiguities, per its discretion.  Essar Steel, 678 F.3d at 1278.  Alternately, Commerce could request permission of the Court to reopen the record.  Id. However, this Court may not order an administrative agency to reopen the record on remand in the absence of extraordinary circumstances.  Id.

Contrary to Rongxin's reading of Essar Steel, that case does not prescribe a formula for granting Commerce permission to reopen the record.  Id.  In the instant Remand Order, the court remanded to Commerce "for further explanation or reconsideration as may be appropriate."

Remand Order at 1254. Prior cases support the proposition that specific language directing Commerce to decide whether to reopen the record on remand is unnecessary. "Commerce generally may reopen the administrative record on remand." Fresh Garlic Producers Ass'n v. United States, 40 CIT ____, ____, 190 F. Supp. 3d 1302, 1306 (2016). "As long as the Court does not forbid Commerce from considering new information, it remains within Commerce's discretion to request and evaluate new data." NTN Bearing Corp. of America v. United States, 25 CIT 118, 124, 132 F. Supp. 2d 1102, 1107 (2001); see Laclede Steel Co. v. United States, 19 CIT 1076, 1078 (1995) ("Any decision to expand the administrative record upon remand is well within [Commerce's] discretion, absent express language from the court barring such action."); Elkton Sparkler Co. v. U.S. Dep't of Commerce, 17 CIT 344, 346 (1993) (holding that since the remand order did not bar Commerce from investigating certain factor information, and since plaintiff raised the issue in its complaint, Commerce did not exceed the scope of the remand order by investigating information in the remand proceeding). In the instant case, the Remand Order did not bar reopening of the record. Therefore, Commerce was authorized to reopen and supplement the record on remand.

**B. Commerce's Findings Were Based on Substantial Evidence**

When Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, the agency's conclusions fall only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. INS v. Elias-Zacarias, 502 U.S. 478, 483–84 (1992), cited in Sucocitrico Cutrale Ltda. v. United States, 36 CIT ____, ____, Slip Op. 12-71 at *1 (June 1, 2012) ("This Court affords Commerce's factual finding a tremendous amount of deference."). Rongxin alleges inconsistencies and even opacity in Dixon's

evidence on remand, and proffers its own evidence allegedly supportive of a finding that Dixon was not a domestic producer of pencils during the POR. Rongxin Comments at 2–9. As discussed below, it cannot be said that the agency's findings that Dixon is a domestic producer of pencils possessing interested party status were unreasonable.

**i. Dixon's Work Orders and Production Screenshots**

In 2012 and 2013, Dixon generated five work orders currently in the record. Exhibit RSQA-1 to Dixon's Response to Supplemental Questionnaire, CR 2 (Apr. 14, 2016). Dixon represents that these work orders, in sequence, describe orders for: 1. Gluing wood slats; 2. Trimming wood slats; 3. Shaping pencils; 4. Painting pencils; and 5. Packing finished pencils. Dixon's Response to Supplemental Questionnaire at 4, PR 7 (Apr. 18, 2016). These work orders are accompanied in the record by corresponding production entries, in the form of screenshots. On the first three of these work orders, the "requested date" and the "start date(s)" predate the POR, while the requested date and start dates on the fourth and fifth work orders occur within the POR. Exhibit RSQA-1 to Dixon's Response to Supplemental Questionnaire, CR 2 (Apr. 14, 2016). The transaction date on each of the five corresponding production screenshots is within the POR. Id. "Machine Hours"[8] and "Labor Hours"[9] appear as categories on every work order, with the former category blank and the latter category populated in each case. Id. The work orders and screenshots list the relevant "branch" as ACE, which Dixon states is a code referring to the facility in Macon,

[8] [[ ]]

[9] [[ ]]

Georgia. Dixon's Response to Second Supplemental Questionnaire at Exhibit RSQA-1, CR 21–25 (Apr. 29, 2016).

Commerce reasonably found Dixon's work orders and production screenshots to be credible evidence that Dixon produced pencils in the United States during the POR. Remand Results at 14–18. Rongxin argues that the work orders contain discrepancies and do not evidence Dixon's being a producer of domestic like product during the POR. Rongxin Comments at 2–8. However, as Commerce explained, based on information in Dixon's questionnaire responses and replies to Rongxin's rebuttal comments, the work orders and screenshots demonstrate a continuous run of pencil production during the POR, at the Macon facility, with certain listed dates predating the POR because they were generated in advance of production;[10] Dixon demonstrated that the transaction dates listed, each of which falls within the POR, are operative. Remand Results at 9, 14–18; Exhibit RSQA-1 to Dixon's Response to Supplemental Questionnaire at 3–4, CR 2 (Apr. 14, 2016); Dixon's Response to Second Supplemental Questionnaire at 5, CR 21–25 (Apr. 29, 2016). Dixon showed, and Commerce reasonably concluded, that product descriptions and labels may change between work orders for a single, continuous run of pencil production, with each order's finished product appearing as a component in the subsequent order's finished product.

[10] As Commerce explains, the first work order represents gluing of slats, while the second represents trimming of slats. Remand Results at 15–16. Though the name of the finished product changes between these orders, the style and dimensions remain the same. Id. The third work order represents shaping of slats into pencils; while the finished product is no longer referred to as a slat, having been shaped into a pencil, the dimensions remain the same. Id. The subsequent work order, representing painting of pencils, lists as components the previous work order's finished product and the type of paint applied thereto. Id. The final work order represents the boxing and packaging of pencils formed in the preceding orders. Id.

Remand Results at 15–16. Read sequentially, the work orders demonstrate the production of lesser components that ultimately contribute to 2557 144-count boxes of golf pencils, the final work order's finished product. Exhibit RSQA-1 to Dixon's Response to Supplemental Questionnaire, CR 2 (Apr. 14, 2016).

Commerce reasonably accorded this production evidence significant weight, and found Dixon's explanation of work order details and alleged inconsistencies illuminating. Remand Results at 17–18. The fact that some fields on the work orders lack data does not mean that relevant production data is absent from the orders, or that the value for those blank fields is zero.[11] Id.; Rongxin's Rebuttal Comments on Dixon's Response to Second Supplemental Questionnaire at 8, CR 26 (May 5, 2016). Commerce's fact-finding in antidumping proceedings is not to be overturned barring a result that no reasonable factfinder could reach. See Sucocitrico Cutrale Ltda., Slip Op. 12-71; Elias-Zacarias, 502 U.S. at 483–84.

Rongxin posits that a certain amount of Dixon's production process must consist of foreign or prefabricated materials, and thus Dixon does not, under the Act, produce pencils at the Macon facility. Rongxin Comments at 8. Rongxin argues that the evidence in the record must demonstrate bona fide production during the POR, and that Dixon might be a "screwdriver operation." Id. at 2–8. Notably, Rongxin does not present legally relevant standards supportive of these de minimis production arguments for the purposes of "interested party" status. Id. Neither the statute nor its legislative history indicate that Commerce must narrow the range of potential interested parties by applying the inquiry that it uses in new shipper reviews to determine whether

[11] Counsel for Dixon noted at oral argument that the labor hours category incorporates time spent running machinery.

a firm has a bona fide domestic production operation.  A domestic "interested party" is "a manufacturer, producer, or wholesaler in the United States of a domestic like product."  19 U.S.C. § 1677(9)(C).  The terms "manufacturer, producer, or wholesaler" are not defined by statute.  Id. The legislative history of the domestic interested party provision states that "standing requirements should be administered to provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation."  Brother Indus. (USA), Inc. v. United States, 16 CIT 789, 794, 801 F. Supp. 751, 757 (1992) (quoting S. Rep. No. 96-249, 96th Cong., 1st Sess. 63 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 449) (internal citation and alteration omitted).  The standing requirement is thus intended to be construed liberally.  Id.  Even if a bona fide production standard were applied, Commerce correctly noted that Rongxin has not precluded a reasonable finding that Dixon was in fact a bona fide producer during the POR, as the actual production dates listed on the work orders and production screenshots demonstrate a sequential five-step pencil production process.  Remand Results at 16.

Commerce likewise reasonably refuted Rongxin's characterization of Dixon as a "screwdriver operation," as that assertion was based on supposition rather than evidence in the record that would detract from Commerce's findings.  Remand Results at 17; Rongxin Comments at 8.  Besides, information regarding the substantial transformation of raw materials into pencils is unnecessary for the Department to determine whether Dixon is a domestic interested party, since 19 U.S.C. § 1677(9) does not include a requirement that a domestic interested party add a specific value to the total product in the United States.

**ii. Rongxin's Proffered Evidence**

Commerce reasonably concluded that photographs of the pencils Rongxin's counsel purchased from four major retailers, and of another brand[12] of pencils found in counsel's office, do not preclude a determination that Dixon produced pencils in the United States during the POR. Rongxin's Rebuttal Comments on Dixon's Response to Supplemental Questionnaire at Exhibits 1–5, PR 10–13 (Apr. 22, 2016) ("photographs"); Remand Results at 5. The photographs "represent only a miniscule, non-representative sample of all Dixon pencils sold in the United States," and further do not speak to the question of Dixon's domestic manufacturing during the POR. Remand Results at 5. Rongxin characterizes this conclusion as "not based on any evidence on the record, much less substantial evidence," and claims that "Dixon has not placed an iota of evidence on the record that it sells anywhere in the world pencils manufactured in the U.S." Rongxin Comments at 7. However, Rongxin conflates the actual inquiry on remand—whether Dixon is an interested party—with the inquiry it seems to pose in its comments, which is whether the four major retailers from which Rongxin purchased the Dixon pencils are representative of Dixon's manufacturing in the U.S. during the POR. Id. Rongxin improperly challenges Commerce to prove a negative: that substantial evidence in the record demonstrates that a given amount of pencils purchased from four major retailers are not representative of Dixon's pencil manufacturing during the POR. In reality, the photographs are substantial evidence only of the fact that Dixon manufactured at least some pencils outside of the United States, at an unclear point in time. This does not preclude domestic pencil production during the POR. Rongxin attempts to place a burden that it should carry onto

[12] [[ ]]

Commerce's shoulders.  See Zenith Elecs. Corp. v. United States, 18 CIT 1145, 1150, 872 F. Supp.

992, 996 (1994) ("[T]he burden of production of evidence to rebut standing has been allocated by

the Federal Circuit to the party challenging standing.") (citing Minebea Co. v. United States, 984

F.2d 1178, 1181 (Fed. Cir. 1993)).

Rongxin submitted to Commerce an Occupational Safety and Health Administration

("OSHA") press release describing that agency's inspection of Dixon's Macon, Georgia facility,

and its fining Dixon $64,085 for twenty-three safety and health violations found there.  Rongxin's

Rebuttal Comments on Dixon's Response to Supplemental Questionnaire at Exhibit 6, PR 10–13

(Sep. 26, 2011) ("OSHA Press Release").  Rongxin also submitted a local news story published

on http://macon.13wmaz.com and dated September 27, 2011.  Id. at Exhibit 7 (Sep. 27, 2011)

("local news story").  The OSHA Press Release states that "[t]he Macon plant prints custom

designs onto pens, pencils and other writing instruments," while the local news story states that

"Company CEO Tim Gomez says the site is not a factory; but they run a screening operation in

5,000 square feet of the 200,000-square-foot distribution center."[13]  OSHA Press Release at 1;

local news story at 2.  Commerce discounted this evidence as nondispositive to the question of

domestic production during the POR, noting that the two articles were issued before the POR

began and that the information was prepared by third party sources for purposes other than

Commerce's administration of the Act.[14]  Remand Results at 5–6, 19–20.

---

[13] The court notes that, contrary to the statement attributed to Dixon CEO Timothy Gomez in the
local news story, the very first sentence of the OSHA Press Release refers to the site as a "factory."

[14] Zenith Electronics Corp. v. United States, 18 CIT 1145, illuminates the instant case.  In Zenith,
Zenith asserted it was a domestic producer of color television receivers and petitioned Commerce
(footnote continued)

Commerce here considered the relevant statements in the OSHA Press Release and local news story. Remand Results at 5–6. Critically, those two pieces of evidence were issued fourteen months prior to the POR. Id. Even if the operative factual assertions therein were entirely true when made, they would not preclude that Dixon produced pencils in the Macon, Georgia facility during the POR, nor render patently unreasonable Commerce's finding of domestic production during the POR.

Rongxin also placed in the record screenshots of Dixon's page on Wikipedia.org, which states that "Dixon Ticonderoga Pencils are no longer made in the USA," and a list of Dixon's "top" twenty-five employees generated on LinkedIn.com, which does not obviously contain an employee who would have overseen pencil production at the Macon facility during the POR. Rongxin's

---

to conduct a review of a relevant antidumping duty order. Zenith, 18 CIT at 1146. In May 1992, Commerce published a notice of initiation of an administrative review, covering the period from April 1, 1991 to March 31, 1992. Id. Respondent challenged Zenith's standing on June 11, 1992, by presenting, among other items, a Zenith press release dated October 29, 1991, indicating that U.S. operations were being moved to Mexico. Id. Zenith on June 16, 1992 submitted an affidavit from its vice president and general counsel stating that at least some production would remain in the United States. Id. Commerce found that the press release could not be read to indicate that Zenith had withdrawn from U.S. color television receiver ("CTV") production, but only that it planned to consolidate CTV final assembly in Mexico sometime after March 22, 1992; even had that occurred, it would not necessarily indicate that Zenith had moved all domestic production. Id. at 1146–47. In its final results of the administrative review, Commerce reiterated that Respondents had produced insufficient evidence to call Zenith's standing into question so as to require further investigation. Id. at 1148.

"The question is what degree of evidence should prompt Commerce to commence an investigation into standing in an administrative review." Id. at 1149. The court reasoned that because Respondents would not be granted admission to investigate production facilities, Commerce thus had an obligation to consider seriously factual information released by Petitioner in news releases. Id. at 1150. The court held that Commerce did sufficiently consider Respondents' charge, and could "not fault the agency for accepting the sworn statements of present fact over prior statements of intent." Id.

Rebuttal Comments on Dixon's Response to Supplemental Questionnaire at Exhibits 8–9, PR 10–13 (Apr. 22, 2016). Commerce discounted the Wikipedia article because of its vagueness and lack of an authoritative citation. Remand Results at 6. Several courts have recognized the dangers of citing Wikipedia entries as legally probative evidence. See United States v. Lawson, 677 F.3d 629, 650 (4th Cir. 2012) (collecting cases). Wikipedia cautions that its open-source editorial policy means that entries can be "easily vandalized" and include unverified information. Id. (quoting Wikipedia's "about" entry); see also Bing Shun Li v. Holder, 400 F. App'x 854, 857–58 (5th Cir. 2010) (expressing "disapproval of [an immigration judge's] reliance on Wikipedia and [warning] against any improper reliance on it or similarly unreliable internet sources in the future"); Badasa v. Mukasey, 540 F.3d 909, 910–11 (8th Cir. 2008) (criticizing an immigration judge's use of Wikipedia and observing that an entry "could be in the middle of a large edit or it could have been recently vandalized").

Similarly, Commerce found unavailing Rongxin's proffered list from LinkedIn of the "top" twenty-five Dixon employees. Remand Results at 6. This evidence does not speak to Dixon's domestic production during the POR. Id. Rongxin again attempts to shift its own burden to Commerce, challenging the agency to find, based on substantial evidence, that the lack of a certain hypothetical employee, such as a "U.S. production manager," on the LinkedIn list is not preclusive of domestic production during the POR. Rongxin's Rebuttal Comments on Dixon's Response to Supplemental Questionnaire at 11, PR 10–13 (Apr. 22, 2016). The court further notes that LinkedIn, like Wikipedia, is often an unreliable evidentiary source. E.g., Shannon v. GFK Custom Research LLC, 4:13-CV-682 CAS, 2013 WL 2395009, at *2 (E.D. Mo. May 30, 2013) (citing Badasa, 540 F.3d at 909–10); see also Am. Auto Logistics, LP v. U.S., 117 Fed. Cl. 137, 224 (Fed.

Cl. 2014), aff'd mem., pursuant to Fed. Cir. R. 36, 599 F. App'x 958 (Fed. Cir. 2015) (noting "obvious, potential evidentiary issues raised by protestor's attachment of website images," including LinkedIn pages, "as exhibits").

In sum, the court concludes that Commerce's findings regarding Rongxin's proffered evidence were reasonable.

**iii. Dixon's CDSOA Materials**

On July 11, 2013, in accordance with the Notice of Intent to Distribute Offset, 78 Fed. Reg. 32,718 (Dep't Homeland Security May 31, 2013) (notice of intent to distribute assessed antidumping or countervailing duties), Dixon submitted a claim to the United States Customs and Border Protection Revenue Division ("CBP") for a Continued Dumping and Subsidy Offset Act of 2000, 19 U.S.C. § 1675c (2000) (repealed 2006) ("CDSOA") distribution[15] under the Cased Pencils/China antidumping duty order. Exhibit 2SQR-2 to Dixon's Response to Second Supplemental Questionnaire, CR 23 (July 11, 2013). Dixon claimed $149,691,306. Id. Attached to Dixon's claim was an affirmation that Dixon "remains in operation and continues to produce the product covered by the antidumping duty order [sic] which the distribution is sought." Id. On December 6, 2013, Dixon received a check for $139,111.72 from the United States Treasury

[15] CDSOA, commonly referred to as the "Byrd Amendment," "provided for the distribution of antidumping duties collected by the United States to 'affected domestic producers' of goods that are subject to an antidumping duty order." Pat Huval Rest. & Oyster Bar, Inc. v. Int'l Trade Comm'n, 785 F.3d 638, 640 (Fed. Cir. 2015) (citations omitted). The Byrd Amendment was repealed in 2006, effective for entries of goods made and filed on or after October 1, 2007. "The repealing statute provided that any duties paid on goods that entered the United States prior to the date of repeal would continue to be distributed in accordance with the pre-repeal statutory scheme." Id.; see Deficit Reduction Act of 2005, Pub. L. No. 109–171, § 7601, 120 Stat. 4, 154 (Feb. 8, 2006).

Department.  Id.  On June 6, 2014, Dixon submitted a claim for another CDSOA distribution, pursuant to the Notice of Intent to Distribute Offset, 79 Fed. Reg. 31,414 (Dep't Homeland Security June 2, 2014) (notice of intent to distribute assessed antidumping or countervailing duties).  Exhibit 2SQR-2 to Dixon's Response to Second Supplemental Questionnaire, CR 23 (June 6, 2014).  Dixon again claimed $149,552,194, but received $6,418.86, in two payments: $5,956.70 on December 1, 2014; and $462.16 on April 24, 2015.  Id.

Commerce found the CDSOA materials supportive of Dixon's status as a producer of domestic like product during the POR.  Remand Results at 18–19.  Rongxin contends that the CDSOA materials are not dispositive because they do not directly evidence manufacturing of domestic like product during the POR, but rather only show that Dixon was an "affected domestic producer," which is not legally identical to a producer of domestic like product for interested party purposes.  Rongxin Comments at 8; Rongxin's Comments on Draft Remand Results at 5, CR 27 (June 3, 2016).  Assuming arguendo that the CDSOA information is not dispositive for these reasons, it regardless buttresses Commerce's finding, and certainly does not detract from it. "Affected domestic producer" need not be identical to "producer of domestic like product" for CDSOA certifications to evidence production of the relevant product covered by the underlying antidumping duty order during a specific fiscal year.  19 U.S.C. § 1675c(b)(1); Remand Results at 18–19.  "[A]n 'affected domestic producer' . . . means any manufacturer [or] producer . . . that remains in operation continuing to produce the product covered by the antidumping duty order . . . ."  19 C.F.R. § 159.61(b)(1).  Here the product is cased pencils, produced during the two fiscal years overlapping the POR.  Exhibit 2SQR-2 to Dixon's Response to Second Supplemental Questionnaire, CR 23 (July 11, 2013).  A company that "did not manufacture that product at all

during the fiscal year that is the subject of the disbursement is not an affected domestic producer."

19 C.F.R. § 159.61(b)(2)(i).  Dixon's CDSOA certifications for fiscal years 2013 and 2014, made

under penalty of law and with knowledge that they were subject to verification by CBP, as well as

the proof of payments resulting from those certifications, thus serve as evidence that Dixon

manufactured pencils domestically during the POR.  Remand Results at 18; Exhibit 2SQR-2 to

Dixon's Response to Second Supplemental Questionnaire at 9, 19, CR 23 (July 11, 2013) ("The

information contained in this certification is true and accurate to the best of the undersigned

certifier's knowledge and belief under penalty of law."); see 19 C.F.R. § 159.63(d) (2012)

("Certifications are subject to verification.").  A reasonable factfinder thus could find "affected

domestic producer" status relevant to the inquiry of domestic production during the POR.

       As to each piece of evidence, and the record as a whole, Commerce's findings were

"reached by 'reasoned decision-making,' including . . . a reasoned explanation supported by a

stated connection between the facts and the choice made."  Elec. Consumers Res. Council v. Fed.

Energy Regulatory Comm'n, 747 F.2d 1511, 1513 (D.C. Cir. 1984) (citing Burlington Truck Lines

v. United States, 371 U.S. 156, 168 (1962); Memphis Light, Gas and Water Div. v. FPC, 504 F.2d

225, 230 (D.C.Cir.1974)).  Even assuming that Commerce could have decided otherwise, the

possibility of two contradictory conclusions, each based on substantial evidence, does not

necessarily invalidate either.  See Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966); see

also Elias-Zacarias, 502 U.S. at 483–84.  In short, Commerce analyzed the record as a whole,

including Rongxin's proffered evidence.  The court concludes that Commerce's determination that

Dixon did produce pencils in the Macon, Georgia facility during the POR, and consequently that

Dixon is an interested party, is based on substantial evidence. See Elias-Zacarias, 502 U.S. at 483–84.

C. **Commerce's Method of Resolving the Interested Party Dispute was in Accordance with Law**

Rongxin argues that Commerce failed to apply its "standard procedure" in determining whether Dixon is a producer of domestic like product. Rongxin Comments at 10–11. Specifically, Rongxin argues that in order for Commerce to find interested party status, it must determine that Dixon passes a six-factor ITC test,[16] per Brother, 16 CIT 789, and that Dixon performs "some important or substantial manufacturing operation" related to cased pencil manufacturing in the United States, per Eurodif S.A. v. United States, 411 F.3d 1355, 1361 (Fed. Cir. 2005).[17] Rongxin Comments at 10–11.

The statute is silent as to a methodology Commerce must use in determining whether a petitioner is a producer in the United States of domestic like product. See 19 U.S.C. §§ 1677(9)(C),

---

16

> (1) the extent and source of [the petitioner's] . . . capital investment; (2) the technical expertise involved in the production activity in the United States; (3) the value added to the product in the United States; (4) employment levels; (5) the quantity and types of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the like product. . . . No single factor is determinative, nor is the list of criteria exhaustive.

16 CIT at 791 (citing Rescission of Initiation of Antidumping Duty Investigation and Dismissal of Petition: Certain Portable Electric Typewriters from Singapore, 56 Fed. Reg. 49,880 (Dep't Commerce Oct. 2, 1991) (rescission of initiation of investigation).

17 Not to be confused with Eurodif S.A. v. United States, 555 U.S. 305 (2009), which considered a different issue. Per Rongxin, "[i]n essence, Eurodif requires bona fide manufacturing operations." Rongxin Comments at 11. See the court's discussion of the applicability of a bona fide manufacturing test in supra section I.B.i.

(10). As has been noted above, supra pp. 8–10, when Commerce's methodology is challenged on the ground that it is not "in accordance with law," we look to see whether the agency's decision was "arbitrary and capricious," reviewing that decision under "the Administrative Procedure Act and any other applicable law." Changzhou Wujin Fine Chem. Factory Co., 701 F.3d at 1374 (citations omitted).

The Court must be able to "discern whether Commerce's finding on the issue is contrary to its past practice or supported by substantial evidence," or else vacate and remand. NMB Sing. Ltd. v. United States, 557 F.3d 1316, 1331 (Fed. Cir. 2009). Rongxin meanwhile "must show that Commerce consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for the change in practice." Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003).

Rongxin fails to meet its burden, having "confused the Department's inquiry into whether a domestic firm is an interested party with the inquiry of whether a domestic party has sufficient industry support to file a petition." Remand Results at 21. In Brother, Commerce chose to apply the six-factor ITC test to determine whether a domestic petitioner, BIUSA, was an "interested party" filing "on behalf of" a domestic industry pursuant to 19 U.S.C. § 1673a(b)(1) (1988), noting counterarguments that BIUSA was merely an assembler of relevant products rather than a manufacturer or producer. 16 CIT at 790. Commerce thereby found that BIUSA was not an interested party under the statute. Id. This court determined that Commerce's finding could not be sustained because the agency had misapplied the test by focusing disproportionately on the intrinsic nature of the product rather than on the nature of production in the United States, and thereby disobeying its statutory mandate. Id. at 795. The agency erred in application, not

methodological selection.   Indeed, "[Commerce] has discretion to utilize any methodology reasonably suited to fulfilling the statutory goals." Id.  Rongxin reads the ITC six-factor test as Commerce's "standard procedure," as approved in Brother.  Rongxin Comments at 10.  But the case itself does not describe the test that way, and no case has been cited supporting that proposition.  Commerce "has elected to use the ITC analysis to determine whether or not a party is a manufacturer," said the court in Brother.  16 CIT at 795.  "If [Commerce] chooses to use the ITC test, as it has done here, it must do so fairly and with regard to statutory language." Id. (emphasis added).  The court's language is conditional because Commerce has discretion to employ a suitable analysis.  Rongxin has thus failed to demonstrate that the ITC test is Commerce's "standard procedure" such that the agency must sufficiently explain departure from its use.  Regardless, counter to Rongxin's argument,[18] Commerce reasonably justified why it chose not to apply the six-factor ITC test.  Remand Results at 21–22.

Commerce explained its reasons for not applying the Eurodif standard:  the analysis in that case pertains to whether there was sufficient domestic industry support to initiate antidumping and countervailing investigations, consistent with the purpose of 19 U.S.C. § 1673a(c)(4)(A) (2000).[19]

---

[18] "Here, Commerce has provided no justification for not using that test." Rongxin Comments at 10 (emphasis in original).

[19] Rongxin misses the importance of context in Eurodif.  In that case, Appellants wanted Commerce to consider American utility companies "producers" for the purposes of determining whether a petitioner had sufficient industry support to trigger Commerce's antidumping and countervailing duty investigation per the requirements of 19 U.S.C. § 1673a(c)(4)(A).  411 F.3d at 1360.  Appellants argued that Commerce's tolling regulation, 19 C.F.R. § 351.401(h) (2004), should apply to the industry support determination, making them "producers," and that Commerce inconsistently applied the tolling regulation by using it determine the export price of low enriched uranium but not using it to make the industry support determination. Id.  Essentially, incorporating
(footnote continued)

411 F.3d at 1360–61; Remand Results at 22.  This is a reasonable explanation for Commerce's

decision not to apply the standard set forth in Eurodif, which, furthermore, Rongxin has not shown

is a regular agency practice for determining whether a petitioner is a producer of domestic like

product possessing interested party status with standing to request an administrative review.

Therefore, Commerce has not acted in an arbitrary and capricious manner.

---

American utilities under the "producer" definition would have diluted industry support for the petition such that the dictates of § 1673a(c)(4)(A) would not have been met.  Id.  This definition was contrary to Commerce's determination in the underlying administrative proceeding that, in order to be a producer, an entity must have a "stake" in the domestic industry in question.  Id. Commerce interpreted having a "stake" as requiring that a company "perform some important or substantial manufacturing operation."  Id. at 1361.  This is the standard that Rongxin would like Commerce to apply to Dixon in the instant case via the definition of "domestic producer."  Rongxin Comments at 11.  However, the very next line in the Eurodif opinion belies Rongxin's argument: "There is no basis to conclude that Commerce's interpretation in this context is unreasonable or not in accordance with law."  411 F.3d at 1361 (emphasis added).

Thus, the Federal Circuit agreed with this court, which had "sustained Commerce's interpretation of the term 'producer' for the purpose of an industry support determination as well as its refusal to apply the tolling regulation to encompass American utilities within the definition of the term 'producer.'"  Id. at 1360 (emphasis added).  The Federal Circuit further found that definition reasonable.  Id. at 1361.

The statutory provisions containing the "domestic producers" term that Commerce interpreted in the Eurodif administrative proceeding were themselves qualified by percentages:  a petition may be filed on behalf of an industry if "the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product," and "more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition."  Id. at 1359, citing 19 U.S.C. § 1673a(c)(4)(A).  This is relevant because it illustrates Commerce's interpretation of "stake" in domestic production, and thus "producer," for the purposes of domestic industry support of a petition.  Neither 19 U.S.C. § 1677(9)(C), defining "interested party," nor 19 U.S.C. § 1675 , the administrative review provision, contain any such quantitative language that would support Rongxin's desired application to Dixon of the standard described in Eurodif.

## II.      Separate Rate

As articulated by Commerce:

> In proceedings involving non-market economy (NME) countries, the Department begins with a rebuttable presumption that all companies within the PRC are subject to government control, and, thus, should be assessed a single antidumping duty rate. It is the Department's policy to assign all exporters of the merchandise subject to review in NME countries a single rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (de jure) and in fact (de facto), with respect to exports.

IDM at 5 (emphasis in original); see generally AMS Assoc., Inc. v. United States, 719 F.3d 1376, 1379–81 (Fed. Cir. 2013). The validity of the presumption is not challenged by Rongxin and is not in issue here. Rather, Rongxin argues that Commerce mistakenly determined that it did not pass Commerce's de facto test with respect to government control over exports, which resulted in a denial of a separate rate for Rongxin. IDM at 3; Pl.'s Br. at 20. As an initial matter, the court notes that only de facto control of Rongxin is at issue in this case, since Commerce conceded that de jure government control is absent.[20]

As Commerce noted, in determining whether an exporter is entitled to a separate rate,

> the Department . . . considers four factors in evaluating whether a respondent is subject to de facto government control of its export functions: (1) whether the export prices are set by, or are subject to the approval of, a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses.

---

[20] "Upon further examination of Rongxin's responses, the Department finds that the evidence provided by the company demonstrates an absence of de jure control . . . ." IDM at 7.

IDM at 7; see also AMS Assoc., Inc., 719 F.3d at 1379.

In its responses to Commerce's questionnaires, Rongxin provided various statements relating to all four factors:

1.  Export price:

"Once Rongxin receives a detailed inquiry from a client, Rongxin has Guangming [Rongxin's supplier of pencils] evaluate all the costs and determine a price quote. Then, Rongxin determines a reasonable profit and make a price quote to the client." Rongxin's First Supplemental Questionnaire Response at 7, PR 40; CR 23–24 (Oct. 16, 2014). "Rongxin did not confer with SITG or SP to establish the pencil price sold to the United States during the POR." Id. at 4. "Prices are set via direct competitive negotiations directly with customers. The prices are not subject to review or guidance by any governmental organization. Exhibit A-5 contains an example of negotiation of a sale in the POR." Rongxin's Section A Questionnaire Response at 6, PR 22–26; CR 4–5 (April 3, 2015).

2.  Authority to negotiate and sign contracts:

"The head of the department five (Stationery and Tools),[21] . . . has the authority to bind the company on sales of pencils. She negotiates directly with the U.S. customer." Id.

3.  Management:

"The management is selected by the board of directors, all of whom are employees. Rongxin is not required to notify any government entity of the names of the management. Exhibit A-6 contains a document indicating the selection of the general manager." Id. at 7.

---

[21] [[                    ]]

4.  Proceeds of export sales/profits:

"Export profits are calculated by subtracting all expenses from the gross sales price.  These profits are disposed of in accordance with the dictates of the board of directors at the annual meeting. . . . There was a profit in 2012 and a profit in 2013."  Id. at 8.

After Rongxin had responded to the questionnaires and provided the information noted above, Commerce announced a new formulation for determination of separate rate, stating that based on its interpretation of Advanced Technology & Materials Co. v. United States, 37 CIT ____, ____, 938 F. Supp. 2d 1342, 1353 (2013), aff'd mem., pursuant to Fed. Cir. R. 36, 581 F. App'x 900 (Fed. Cir. 2014), it was not necessary to consider all four factors; rather, where the respondent exporter had not shown "autonomy from the government in making decisions regarding the selection of management," the presumption of de facto control over export activities had been established and there was no need to consider the other three prongs in the calculus.  See IDM at 5–6.[22]  This court does not read Advanced Technology as standing for the proposition now

---

[22]          Following the Court's reasoning, in recent proceedings, we have concluded that where a government entity holds a majority ownership share, whether directly or indirectly, in the respondent exporter, the majority ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the company's operations generally.  This may include control over, for example, the selection of management, a key factor in determining whether a company has sufficient independence in its export activities to merit a separate rate.  Consistent with normal business practices, we would expect any majority shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company.

IDM at 6.

asserted by Commerce. Each case is decided upon its own facts, and Advanced Technology, and the basis upon which it was decided, is not precedential nor dispositive, particularly where the court in that case did not address the issue now presented. In Advanced Technology, in contrast to the case before us, the respondent exporter had only provided evidence, not deemed persuasive by the court, rebutting the purported absence of autonomy from the government in making decisions regarding the selection of management. 37 CIT at ____. There was an absence of information adduced by the exporter regarding the other three prongs, and under the circumstances, the court determined that with respect to the criterion of autonomy from the government, the respondent had not met its burden to rebut the presumption of de facto control. Id. Advanced Technology does not hold that the failure of a respondent to meet its burden with respect to that single criterion necessarily ends the analysis and makes unnecessary consideration of information provided regarding the other three prongs. Id. In that regard we further note that while the issue was not therein joined, the Federal Circuit, in recounting how Commerce allows the presumption of government control to be overcome, has observed that "[t]he absence of de facto government control can be shown by evidence that the exporter sets its prices independently of the government and of other exporters, negotiates its own contracts, keeps the proceeds of its sales (taxation aside), and selects its management autonomously." AMS Assoc., Inc., 719 F.3d at 1379. We accordingly remand this case for further determination regarding consideration of the other criteria, as well as a determination of the ultimate calculus, including the impact of the criterion regarding autonomous selection of management. In so doing, this court expresses no view as to whether the question of entitlement to a separate rate is to be determined under a totality of the circumstances, whether a respondent must satisfy each of the four criteria, or whether, for example, the failure to

establish autonomy from the government in the selection of management, or a finding of lack of

such autonomy, can alone justify denial of a separate rate, even when there is evidence supportive

of the exporter offered with respect to the other criteria.  These are issues that may be addressed

on remand.

While we remand, in the interest of judicial and litigation economy, we do address and

sustain Commerce's determination that Rongxin has not shown that it selects its management

autonomously of the PRC government.  Rongxin states that Commerce incorrectly found that

SITG, the government-owned company owning a majority of Rongxin, has the ability to designate

all members of Rongxin's board of directors, because SITG can only nominate one of the six

directors.  Article 12;[23]  Pl.'s Br. at 29.  Moreover, Rongxin maintains that its board members are

elected by its eleven shareholders, consisting of SITG and ten employees, voting as individual

members.  See Article 10;[24]  see also Pl.'s Br. at 29.  Thus, Rongxin claims that SITG has only

---

[23] Rongxin claims that an alternative translation of Article 12 is the correct translation:  [[


]] Rongxin Case Br.
at 11 n.1.  Rongxin maintains that "Commerce has analysts who can confirm this new translation
is correct."  Id.  By comparison, the Revised Articles translate Article 12 as follows:  [[


]] Rongxin argues that the Revised Articles
inaccurately characterize SITG as having a supervisory role over Rongxin's operations, whereas
the alternative translation omits this phraseology and characterization.  Even if the court were to
credit Rongxin's translation, the court's analysis would remain unchanged.

[24] Article 10 [[



]]

"1/11 of the vote of the shareholder meeting and 1/6 of the vote of the board of directors." Pl.'s Br. at 31.

While acknowledging that SITG owns a majority of the shares, Rongxin states that the director appointed by SITG can cast only one vote per Article 16.4.[25] IDM at 3. Therefore, Rongxin maintains that SITG lacks control over Rongxin's export activities, as SITG can only cast one vote. Pl.'s Br. at 24. Rongxin also claims that its Board did not appoint the manager of the stationery department who it asserts has the power to decide U.S. prices; in its view, pursuant to Article 13.9, the Board has the power to select "only three managers: general manager, vice manager, and the financial principal." Pl.'s Br. at 30 (emphasis added).[26] In sum, Rongxin asserts that Commerce's conclusion that Rongxin had not established independent selection of management was not based upon substantial evidence on the record. Furthermore, it contends that Commerce made a clear error in understanding the facts relevant to this review and thus Commerce's findings are erroneous, citing Yancheng Baolong Biochemical Products Co., Ltd. v. United States, 406 F.3d 1377, 1380 (Fed. Cir. 2005). Rongxin Case Br. at 11.

Rongxin's arguments fail for several reasons. Most importantly, Rongxin ignores the fact that although Article 10 requires a specified proportion of the stockholder's vote in some instances, it is silent as to the number of votes needed to elect the Board.[27] See supra n.24. Given that the

---

[25] Article 16.4 [[

                                    ]]

[26] Article 13.9 [[

                                              ]]

[27] Article 10 [[                                              ]]

Articles are silent and Rongxin put forth no evidence to the contrary, Commerce reasonably concluded that the Board is elected by a majority of the shareholders.  Consequently, Commerce found that SITG, as majority shareholder[28] which in turn is wholly-owned by the state entity SASAC, has the ability to appoint the other four directors[29] who decide on management pursuant to Articles 13.9 and 13.3.  See Advanced Tech., 938 F. Supp. 2d at 1353; see also IDM at 7.  Rongxin provided no evidence to undermine the finding that management here was effectively selected by the PRC.

Rongxin contends that shareholders "vote as individual members" such that SITG has only 1/11 of the voting power in shareholder meetings.  Pl.'s Br. at 29.  However, Article 7.2 suggests that the shareholder's vote is proportional to shareholding and that the shareholders do not vote as eleven individual members.[30]  Rongxin argues that Article 7 is limited in scope to the payment of shares by shareholders and not voting rights, because each article discusses a unique topic, and Article 6 is the article which deals exclusively with voting rights.  Pl.'s Reply at 10–11.  The court, however, is persuaded by Commerce's determination that Article 7.2 encompasses voting rights and on a reasonable interpretation on its face is not limited in the way Rongxin contends.

The court also discerns no merit in Rongxin's argument, based on its interpretation of Article 13.9, that its Board did not appoint the stationery manager who decides U.S. prices and

---

[28] SITG owns [[                                        ]]

[29] There was one vacancy on the Board of Directors during the POR.  Pl.'s Br. at 21.

[30] Article 7.2 [[
                                        ]]

that autonomy from the government in the selection of management is thereby established. For one thing, on its face, Article 13.9 does not limit the class of managers appointed by the Board in the way Rongxin contends. See supra n.26. For another thing, even if the stationery manager were not appointed by the Board, given that SITG owns a majority of Rongxin's shares and had the responsibility of electing the Board of Directors, Commerce reasonably determined that SITG still had "major input in the selection of Rongxin's management" under Article 13.3—such that Rongxin does not have autonomy from the government in the selection of management.[31] Final Separate Rate Analysis Memorandum for Shandong Rongxin Import & Export Co., Ltd. at 5, PR 52; CR 34 (April 30, 2015); see also Sigma, 117 F.3d at 1405–06.[32]

In sum, the court remands this case for further determination regarding consideration of the other separate rate criteria, as well as a determination of the ultimate calculus, including the impact of the finding regarding autonomous selection of management. See supra pp. 32–35.

[31] Article 13.3 broadly gives the Board the power to [[ ]]

[32] We note that Commerce maintains that "where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter, the majority ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the company's operations generally." IDM at 6 (emphasis added) (citing Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China (May 6, 2013) in Advanced Tech. & Materials Co., Ltd. v. United States, 36 CIT ____, 885F. Supp. 2d 1343 (2012), accord. Advanced Tech. & Materials Co., Ltd v. United States, 37 CIT ____, 938 F. Supp. 2d 1342 (2013)). The court in Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States, 38 CIT ____, ____, 28 F. Supp. 3d 1317, 1348 (2014) stated that it is not the "possibility for government control over export activities" which is dispositive of the de facto autonomy inquiry but whether "such control was in fact reasonably likely to have been exercised during the period of investigation." (Emphasis added). Our determination here does not turn on which formulation of the de facto inquiry is adopted.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Rongxin's motion for judgment on the agency record is denied in part; and it is further

**ORDERED** that Commerce's determination regarding Rongxin's eligibility for a separate rate is remanded for further consideration consistent with this opinion; and it is further

**ORDERED** that Commerce's Results of Redetermination Pursuant to Court Remand are sustained in all other respects; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

**ORDERED** that the parties shall have 15 days thereafter to file replies to comments on the remand determination.

/s/ Gary S. Katzmann
Judge

Dated: February 3, 2017
New York, New York