Slip Op. 18-107

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHANDONG RONGXIN IMPORT & EXPORT CO., LTD., | |
| Plaintiff, | |
| v. | Before: Gary S. Katzmann, Judge |
| UNITED STATES, | Court No. 15-00151 |
| Defendant, | **PUBLIC VERSION** |
| and | |
| DIXON TICONDEROGA COMPANY, | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[Commerce's "<u>Second Remand Results</u>" Pursuant to Court Remand are sustained.  Plaintiff's Motion for Judgment on the Agency Record is denied.]

Dated:   August 29, 2018

<u>John J. Kenkel</u>, deKieffer & Horgan, PLLC, of Washington, DC, argued for plaintiff.  With him on the brief were <u>J. Kevin Horgan</u> and <u>Judith Holdsworth</u>.

<u>Kelly Ann Krystyniak</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, <u>Robert M. Norway</u>, Trial Counsel, and <u>Melissa L. Baker</u>, Trial Counsel.  Of counsel on the brief were <u>Brendan Saslow</u> and <u>Emily R. Beline</u>, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Felicia Leborgne Nowels</u>, Akerman LLP, of Tallahassee, FL, argued for defendant-intervenor. With her on the brief was <u>Sheryl D. Rosen</u>.

Katzmann, Judge:  In this third round of litigation before the Court of International Trade, the Court returns to a "case about pencils," but much more than that.  <u>Shandong Rongxin Imp. & Exp. Co. v. United States</u>, 41 CIT ___, ___, 203 F. Supp. 3d 1327 (2017).  It is well-established that in determining the antidumping margin applied to goods from a non-market economy ("NME"), there is a rebuttable presumption that respondents in such proceedings are government-controlled and subject to a single country-wide anti-dumping rate.  The principal issue now under review is whether the exporter of goods from an NME has shown the absence of de facto government control and is entitled to a separate rate.  Plaintiff, Shandong Rongxin Import & Export Co., Ltd. ("Rongxin"), an exporter of pencils from the People's Republic of China ("PRC" or "China"), challenges the Final Results of Redetermination Pursuant to Court Remand, May 19, 2017, ECF Nos. 87–88 ("<u>Second Remand Results</u>").  Rongxin initially brought this action against Defendant, the United States ("the Government"), on May 22, 2015, disputing certain aspects of the final administrative review results issued by the United States Department of Commerce ("Commerce") in <u>Certain Cased Pencils from the People's Republic of China</u>, 80 Fed. Reg. 26,897 (Dep't Commerce May 11, 2015) (final results of antidumping duty administrative review, 2012–2013) ("<u>Final Results</u>") and accompanying Issues and Decision Memorandum at 2 (Apr. 30, 2015) ("<u>IDM</u>").  Since then, the Court has twice remanded this case to Commerce for further consideration of certain discrete issues.  Rongxin now asks this Court to order another remand, while the Government and Defendant-Intervenor, Dixon Ticonderoga Company ("Dixon"), ask the Court to sustain Commerce's determination.  For the reasons provided herein, the Court sustains Commerce's <u>Second Remand Results</u> in full.

# BACKGROUND

## A.    Legal Background

Pursuant to 19 U.S.C. § 1673 (2012),[1] Commerce imposes antidumping duties on foreign

goods if they are being or are likely to be sold in the United States at less than fair value and the

International Trade Commission ("ITC") determines that the sale of the merchandise at less than

fair value materially injures, threatens, or impedes the establishment of an industry in the United

States.   Diamond Sawblades Manufacturers Coal. v. United States, 866 F.3d 1304, 1306 (Fed.

Cir. 2017).   "Sales at less than fair value are those sales for which the 'normal value' (the price a

producer charges in its home market) exceeds the 'export price' (the price of the product in the

United States)."  Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1322, 1326 (Fed. Cir.

2017) (quoting Union Steel v. United States, 713 F.3d 1101, 1103 (Fed. Cir. 2013)).   Thus the

amount of the antidumping duty is "the amount by which the normal value exceeds the export

price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673.  Upon the request

of an interested party, Commerce conducts a yearly administrative review of the antidumping duty

order and calculates a new antidumping duty rate.   Id. § 1675(a)(1)–(2).   In these proceedings,

Commerce "shall determine the individual weighted average dumping margin for each known

exporter and producer of the subject merchandise."  19 U.S.C. § 1677f-1(c)(1).

This case concerns Commerce's discrete procedure for determining the antidumping duty

margin applied to goods from an NME country, here the PRC.  An NME country, such as China,

is "any foreign country that [Commerce] determines does not operate on market principles of cost

or pricing structures, so that sales of merchandise in such country do not reflect the fair value of

the merchandise."   19 U.S.C. § 1677(18)(A).   In antidumping duty proceedings involving

---

[1] Subsequent citations to the United States Code are to the official 2012 edition.

merchandise from an NME country, Commerce presumes that all respondents to the proceeding

are government-controlled and therefore subject to a single country-wide antidumping duty rate.

Dongtai Peak Honey Indus. Co. v. United States, 777 F.3d 1343, 1349–50 (Fed. Cir. 2015) (citing

Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997)).  However, respondents may

rebut the presumption of government control, and thus become eligible for a separate rate, by

establishing the absence of both de jure (legal) and de facto (factual) government control.  Id. at

1350.

An exporter can demonstrate the absence of de jure control by referring "to legislation and

other governmental measures that suggest sufficient company legal freedom." AMS Assocs., Inc.

v. United States, 719 F.3d 1376, 1379 (Fed. Cir. 2013).  An exporter can demonstrate the absence

of de facto government control by providing evidence that the exporter: (1) sets its prices

independently of the government and of other exporters, (2) negotiates its own contracts, (3)

selects its management autonomously, and (4) keeps the proceeds of its sales (taxation aside).  Id.

If a respondent fails to establish its independence, Commerce continues to presume government

control and applies the country-wide rate to that respondent.  Dongtai 777 F.3d at 1350 (citing

Transcom, Inc. v. United States, 182 F.3d 876, 882 (Fed. Cir. 1999)).

## B.      **Factual and Procedural Background**

On December 21, 1994, the ITC published its determination that an industry in the United

States is materially injured or threatened with material injury by reason of imports from the PRC

of certain cased pencils that Commerce had determined to be sold in the United States at less than

fair value.  Certain Cased Pencils from the People's Republic of China, USITC Pub. 2837, Inv.

No. 731–TA–669, 59 Fed. Reg. 65,788 (Dec. 21, 1994) (final determination).  On December 28,

Commerce published the antidumping duty order covering certain cased pencils from China.

Certain Cased Pencils from the People's Republic of China, 59 Fed. Reg. 66,909 (Dep't Commerce

Dec. 28, 1994) (final results of antidumping duty order).

On December 20, 2013, pursuant to 19 U.S.C. § 1675, Dixon filed a request for

administrative review of Rongxin, an exporter of pencils from the PRC.   Req. for Admin. Rev.,

PR 1 (Dec. 20, 2013).   In accordance with its Articles of Association, Rongxin is a corporation

owned by eleven shareholders and directed by a six-member board.    Rongxin First Suppl.

Questionnaire Resp. at Ex. SQ-2, Revised Rongxin Articles of Association, PR 40, CR 23–24 (Oct.

16, 2014) ("Articles"); Rongxin's Sec. A Questionnaire Resp. at Ex. A–2, Shareholders, PR 22–

26, CR 4–15 (Apr. 3, 2015).   Slightly more than a majority of Rongxin[2] is owned by Shandong

International Trade Group ("SITG"), which in turn is wholly-owned by the State-Owned Assets

Supervision and Administration Commission ("SASAC").   Rongxin's Sec. A Questionnaire Resp.

at 2.  The remainder of Rongxin is owned by ten Rongxin employees.  Id.

On February 3, 2014, Commerce initiated an administrative review of Rongxin.   The

Period of Review ("POR") covered by the administrative review was December 1, 2012, through

November 30, 2013. IDM at 1.   During the administrative review, Rongxin argued that, first, it

deserves a separate rate because it can demonstrate the absence of government control both de jure

and de facto, and second, Commerce should rescind the initiation of the administrative review

because there is no evidence on the record that Dixon is a domestic manufacturer entitled to request

a review.

As noted, in the process of determining whether an exporter is entitled to a separate rate,

Commerce

---

[2] [[    ]] percent.

considers four factors in evaluating whether a respondent is subject to de facto government control of its export functions: (1) whether the export prices are set by, or are subject to the approval of, a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses.

IDM at 7; see AMS Assocs., 719 F.3d at 1379.  In its responses to Commerce's questionnaires, Rongxin provided various statements relating to all four factors of the de facto control inquiry:

1. Export price:

"Once Rongxin receives a detailed inquiry from a client, Rongxin has Guangming [Rongxin's supplier of pencils] evaluate all the costs and determine a price quote.  Then, Rongxin determines a reasonable profit and make a price quote to the client."  Rongxin's First Suppl. Questionnaire Resp. at 7. "Rongxin did not confer with SITG . . . to establish the pencil price sold to the United States during the POR."  Id. at 4.  "Prices are set via direct competitive negotiations directly with customers.  The prices are not subject to review or guidance by any governmental organization.  Exhibit A–5 contains an example of negotiation of a sale in the POR." Rongxin's Sec. A Questionnaire Resp. at 6.

2. Authority to negotiate and sign contracts:

"The head of the department five (Stationery and Tools), . . .  has the authority to bind the company on sales of pencils.  She negotiates directly with the U.S. customer."  Id.

3. Management:

"The management is selected by the board of directors, all of whom are employees. Rongxin is not required to notify any government entity of the names of the management.  Exhibit A–6 contains a document indicating the selection of the general manager."  Id. at 7.

4. Proceeds of export sales/profits:

"Export profits are calculated by subtracting all expenses from the gross sales price. These profits are disposed of in accordance with the dictates of the board of directors at the annual meeting. . . . There was a profit in 2012 and a profit in 2013." Id. at 8.

Commerce published the Final Results of its administrative review on May 11, 2015.  80 Fed. Reg. 26,897; see IDM.  Commerce found that there was no evidence "on the record that undermines or calls into question Dixon's certification [that it is an interested party]."  IDM at 9. As to the question of separate rate, after Rongxin had responded to the questionnaires and provided the information noted above, Commerce announced a new formulation for determining a separate rate, stating that based on its interpretation of Advanced Technology & Materials Co. v. United States, 37 CIT ___, ___, 938 F. Supp. 2d 1342, 1353 (2013), aff'd mem., pursuant to Fed. Cir. R. 36, 581 Fed. Appx. 900 (Fed. Cir. 2014), it was not necessary to consider all four factors; rather, where the respondent exporter had not shown "autonomy from the government in making decisions regarding the selection of management," the presumption of de facto control over export activities had not been rebutted and there was no need to consider the other three prongs in the calculus. IDM at 5–6.  Commerce ultimately found that evidence provided by Rongxin demonstrated an absence of de jure government control.  Id. at 7.  However, Commerce continued to find that Rongxin had not demonstrated an absence of de facto government control.  Id. at 8.

Rongxin brought this action against the United States on May 22, 2015, disputing certain aspects of the Final Results.  Compl., ECF No. 4, May 22, 2015; see Shandong Rongxin Import & Export Co., Ltd., v. United States, 40 CIT ___, ___, 163 F. Supp. 3d 1249, 1254–55 (2016) ("Rongxin I").  Mirroring its arguments from the administrative phase, Rongxin contended that it deserved a separate rate, because it demonstrated absence of government control, both de jure and

de facto. Id. at 1251. Rongxin also argued that Commerce's initiation of the administrative review

was void ab initio because Dixon failed to claim that it was a domestic interested party, that is, a

United States manufacturer of pencils during the POR. Id. The Court remanded this case for

further explanation or reconsideration as may be appropriate with regard to the issue of whether

Dixon is an interested party with standing to request an administrative review of Rongxin. Id. at

1254. The Court declined to reach the issue of whether Rongxin deserves a separate rate until the

threshold issue of standing was resolved. Id.

Commerce reopened the record on remand, issuing two supplemental questionnaires to

Dixon and accepting rebuttal comments from Rongxin. Commerce filed its remand results on June

17, 2016. Final Results of Redetermination Pursuant to Court Remand, ECF No. 50 ("First

Remand Results"). Commerce continued to find that Dixon is a producer of domestic like product

and, as such, is an interested party with standing to request an administrative review. Id. at 1.

Rongxin challenged several aspects of the First Remand Results before this Court. See

Shandong Rongxin Imp. & Exp. Co. v. United States, 41 CIT ___, ___, 203 F. Supp. 3d 1327

(2017) ("Rongxin II").[3] Specifically, Rongxin argued that Commerce was not authorized to

reopen the record on remand, and that it erred in finding that Dixon was a producer of domestic

like product possessing interested party status with standing to request an administrative review.

Id. at 1333. Rongxin also argued that it was not under de facto PRC control during the POR and

thus is entitled to an antidumping duty rate separate from the PRC-wide rate assessed by

Commerce. Id.

---

[3] On September 21, 2016, following the retirement of Judge Tsoucalas, the Chief Judge reassigned
the case to a different Judge. Order of Reassignment, Sept. 20, 2016, ECF No. 62.

The Court determined that Commerce was authorized to reopen the record on remand, and that agency's finding that Dixon was an interested party was supported by substantial record evidence.  Id. at 1337–45.  The Court noted Commerce's position that <u>Advanced Technology</u> rendered unnecessary consideration of all four factors in the de facto control inquiry when a respondent exporter had not shown "autonomy from the government in making decisions regarding the selection of management." <u>Id.</u> (quoting <u>IDM</u> at 5–6).  Per Commerce, in that scenario, there is no need to consider the other three prongs in the calculus.  <u>Id.</u>  In light of Commerce's position, the Court explained that it

> does not read <u>Advanced Technology</u> as standing for the proposition now asserted by Commerce. . . .  In <u>Advanced Technology</u>, in contrast to the case before us, the respondent exporter had only provided evidence, not deemed persuasive by the court, rebutting the purported absence of autonomy from the government in making decisions regarding the selection of management.  []938 F. Supp. 2d 1342.  There was an absence of information adduced by the exporter regarding the other three prongs, and under the circumstances, the court determined that with respect to the criterion of autonomy from the government, the respondent had not met its burden to rebut the presumption of de facto control.  <u>Id.</u>  <u>Advanced Technology</u> does not hold that the failure of a respondent to meet its burden with respect to that single criterion necessarily ends the analysis and makes unnecessary consideration of information provided regarding the other three prongs.  <u>Id.</u>

<u>Rongxin II</u>, 203 F. Supp. 3d at 1348.

The Court remanded the case "for further determination regarding consideration of the other criteria, as well as a determination of the ultimate calculus, including the impact of the criterion regarding autonomous selection of management."  <u>Id.</u>  In so doing, the Court stated that it was expressing no view as to whether the de facto control inquiry is to be determined

> under a totality of the circumstances, whether a respondent must satisfy each of the four criteria, or whether, for example, the failure to establish autonomy from the government in the selection of management, or a finding of lack of such autonomy, can alone justify denial of a separate rate, even when there is evidence supportive of the exporter offered with respect to the other criteria.

Id. at 1348–49.  Though it remanded, the Court also sustained Commerce's determination that

Rongxin has not shown that it selects its management autonomously of the PRC government.  Id.

at 1349.  In doing so, the Court reviewed Commerce's analysis of several of Rongxin's Articles

of Association, and stated, in relevant part, that

> Rongxin ignores the fact that although Article 10[4] requires a specified proportion
> of the stockholder's vote in some instances, it is silent as to the number of votes
> needed to elect the Board. . . . Given that the Articles are silent and Rongxin put
> forth no evidence to the contrary, Commerce reasonably concluded that the Board
> is elected by a majority of the shareholders.  Consequently, Commerce found that
> SITG, as majority shareholder which in turn is wholly-owned by the state entity
> SASAC, has the ability to appoint the other four directors[5] who decide on
> management pursuant to Articles 13.9[6] and 13.3.[7]  See Advanced Tech., 938 F.
> Supp. 2d at 1353; see also IDM at 7.  Rongxin provided no evidence to undermine
> the finding that management here was effectively selected by the PRC. . . .
>
> Article 7.2 suggests that the shareholder's vote is proportional to shareholding and
> that the shareholders do not vote as eleven individual members.[8]  Rongxin argues
> that . . . Article 6 is the article which deals exclusively with voting rights. . . . The
> court, however, is persuaded by Commerce's determination that Article 7.2
> encompasses voting rights and on a reasonable interpretation on its face is not
> limited in the way Rongxin contends.
>
> The court also discerns no merit in Rongxin's argument, based on its interpretation
> of Article 13.9, that its Board did not appoint the stationery manager who decides
> U.S. prices and that autonomy from the government in the selection of management
> is thereby established. For one thing, on its face, Article 13.9 does not limit the
> class of managers appointed by the Board in the way Rongxin contends. . . . For

---

[4] Article 10 [[                                                                    ]]

[5] There was one vacancy on the Board of Directors during the POR.  Rongxin II, 203 F. Supp. 3d
at 1350 n.29.

[6] Article 13.9 states that the "Board of the directors take responsibility for the holders' meeting,
having the following right: . . . Appoint or dismiss the manager. Appoint or dismiss the vice
manager & financial principal according to the manager's recommendation."

[7] Article 13.3 broadly gives the Board the power to [[                                          ]]

[8] Article 7.2 states the [[
                                          ]]

> another thing, even if the stationery manager were not appointed by the Board, given that SITG owns a majority of Rongxin's shares and had the responsibility of electing the Board of Directors, Commerce reasonably determined that SITG still had "major input in the selection of Rongxin's management" under Article 13.3— such that Rongxin does not have autonomy from the government in the selection of management. Final Separate Rate Analysis Memorandum for Shandong Rongxin Import & Export Co., Ltd. at 5, PR 52; CR 34 (April 30, 2015); <u>see also</u> <u>Sigma Corp. v. United States</u>, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997).

<u>Rongxin II</u>, 203 F. Supp. 3d at 1349–50 (some citations omitted).

On April 24, 2017, Commerce issued its draft of the second remand redetermination. Rongxin submitted comments on April 28. Commerce issued the <u>Second Remand Results</u> on May 19. In them, Commerce continued to find that Rongxin is not eligible for a separate rate because it has not demonstrated the absence of de facto control by the PRC government. <u>Second Remand Results</u> at 1. Commerce noted that, in response to this Court's decisions in "the <u>Advanced Tech.</u> line of cases," it "has determined that respondents that are wholly or majority owned by, and thus under control of, the SASAC, are presumptively not entitled to separate rates." <u>Id.</u> at 10 (citations omitted). Commerce also explained that it "has consistently found that where a government entity holds a majority ownership share, either directly or indirectly in the respondent exporter, the majority ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the company's operations generally." <u>Id.</u> Commerce thus continued to conclude that SITG -- which was wholly-owned by SASAC and was majority owner of Rongxin during the POR -- exercises, or has the potential to exercise, control over Rongxin's day-to-day operations, including the ability to control the selection of management. <u>Id.</u> at 10–11.

Notwithstanding the Court's affirmance of Commerce's determination on this prong, <u>Rongxin II</u>, 203 F. Supp. 3d at 1349, Commerce reexamined whether Rongxin established that it has autonomy from the government in making decisions regarding the selection of management. <u>Second Remand Results</u> at 12. Commerce again reviewed Rongxin's Articles of Association,

which establish that the shareholders appoint five of the six directors on the Board of Directors, while SITG appoints one of the six directors.  Id.  Commerce referred to Article 7.2, which speaks to proportionality between share ownership and influence over company operations, and stated that it is reasonable to conclude that SITG, as majority owner of Rongxin, has influence proportionate to its majority shareholding.  Id.  Commerce also noted several provisions of Article 13, which concerns the responsibilities of the Board of Directors, and described the Board's influence over company management.[9]  Id. at 13.  Altogether, Commerce concluded that, with regard to this prong, "record evidence demonstrates that the Articles of Association authorize and direct that the Board of Directors exert control over the day-to-day management and regular business functions of Rongxin."  Id.

Citing prior determinations, Commerce reemphasized its position that failure to demonstrate autonomy from the government in making decisions regarding the selection of management is sufficient to conclude that a company has failed to prove an absence of de facto government control, and that it is unnecessary to analyze the other three de facto criteria.  Id. at 13–14;  see 1,1,1,2 Tetrafluoroethane (R-134a) from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, in Part, 82 Fed. Reg. 12,192 (Dep't Commerce Mar. 1, 2017) and accompanying

---

[9] Commerce explained that

[[



]]

Second Remand Results at 13.

IDM at 12–16; <u>Countervailing Duty Investigation of Stainless Steel Sheet and Strip from the People's Republic of China: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part</u>, 82 Fed. Reg. 9714 (Dep't Commerce Feb. 8, 2017) and accompanying IDM at 28–29.  Commerce also asserted that its approach has been upheld by this Court in <u>Yantai CMC Bearing Co. Ltd. v. United States</u>, 41 CIT ___, ___, 203 F. Supp. 3d 1317, 1325–26 (2017) ("<u>Yantai</u>"), which, Commerce argues, also involves a similar fact pattern.  In the administrative review at issue in <u>Yantai</u>, Commerce found that the majority owner of Yantai CMC, China National Machinery Import & Export Corporation ("CMC"), was indirectly owned by SASAC and that CMC had the authority to appoint the majority of Yantai CMC's directors, as well as the power to nominate the general manager, and to appoint the company's general management.  <u>Yantai</u>, 203 F. Supp. 3d at 1323–24.  The Court held that Commerce properly found "actual exercise of control through the appointment of officials and the overlap in management between the companies."  <u>Id.</u> at 1326.  The Court also explained that "[a]s an exporter in an NME country that is indirectly majority-owned by the government, Yantai CMC has the burden to show that it has such autonomy. . . . Yantai CMC failed to meet the third factor of the test. Given that all four factors must be satisfied, Commerce had no further obligation to continue with the analysis."  <u>Id.</u> (citing <u>Sigma Corp.</u>, 117 F.3d at 1406), <u>quoted in</u> <u>Second Remand Results</u> at 16.

Though asserting that the Court in <u>Rongxin II</u>, 204 F. Supp. 3d at 1348–50, did not explicitly require Commerce to make findings with respect to each criterion in the de facto control analysis, and denying any obligation to do so on the basis of its aforementioned position, Commerce nevertheless reviewed anew whether Rongxin established an absence of de facto control with respect to the three other prongs of the analysis.  <u>Second Remand Results</u> at 20. Specifically, Commerce reviewed the information provided by Rongxin regarding the setting of

export prices, the negotiation of contracts, and the disposal of its profits.  See <u>AMS Assocs.</u>, 719

F.3d at 1379.

First, despite Rongxin's claim that its prices are established through direct competitive

negotiation rather than governmental review and guidance, Commerce determined that the Articles

stipulate that the Board directs Rongxin's financial matters.[10]  <u>Id.</u> at 20.  Second, though Rongxin

claimed in its questionnaire response that the head of Stationery and Tools negotiates directly with

the U.S. customer and no organization outside of Rongxin reviews or approves any aspect of the

transaction, Commerce determined that this fact is not dispositive as to whether Rongxin

negotiates contracts autonomously of the government.  <u>Id.</u> at 20–21. Rather, Commerce reasoned

that provisions in the Articles which imbue the Board with power over management,[11] in

conjunction with SITG's effective control over the Board, indicate that Rongxin is not free to set

its prices or make decisions regarding the negotiation of contracts autonomously of the PRC

government.  <u>Id.</u> at 21.  Third, Commerce reviewed multiple provisions of the Articles which state

that the Board controls revenue and profit distribution,[12] and determined that proceeds of sales and

profits made for the benefit of Rongxin are returned to SITG in proportion to its majority

---

[10] Article 13.4 stipulates that the Board decides Rongxin's budget and the final accounting of revenue, which would include overseeing the setting of prices for subject merchandise and negotiation of contracts.  Article 13.4 also specifies that the Board of Directors, "[d]ecide[s] the company's scheme of budget & final accounting of revenue and expenditure."

[11] Article 13.9 states the board of directors have the right to "Appoint or dismiss the manager. Appoint or dismiss the vice manager & financial principal according to the manager's recommendation. "  Further, Article 19.2 states that the board will "supervise the action of directors, managers when they execute their duty, in case they break the law or regulations."

[12] Article 13.4 states that the Board makes decisions involving the revenue generated by Rongxin and [[
                          ]]  In addition, [[
                                                            ]]

investment; in other words, profits are proportionally transferred to the PRC government through

SASAC.  Id.  Accordingly, Commerce determined that Rongxin does not autonomously decide the

disposition of profits or financing.   In summary, Commerce determined that Rongxin failed to

demonstrate autonomy as to any of the four factors in the de facto control analysis because SITG

has effective control over the Board, and the Board makes decisions implicating each of the four

factors.  Id. at 21.

Separately, Commerce addressed Rongxin's argument, based on China Manufacturers

Alliance, LLC v. United States, 41 CIT ___, 205 F. Supp. 3d 1325 (2017) ("China Mfrs.

Alliance"), that Commerce's policy cannot overrule a statutory provision, and thus Rongxin is

entitled to its own weighted-average dumping margin.  Second Remand Results at 23.  Commerce

first noted that China Mfrs. Alliance was under remand during the issuance of the Second Remand

Results in this case.   Id.   Second, Commerce determined that China Mfrs. Alliance is

distinguishable from this proceeding.  Id.  In China Mfrs. Alliance, Commerce calculated a

weighted-average margin for the mandatory respondent Double Coin Holdings Ltd. and its two

affiliates using verified sales information.  205 F. Supp. 3d at 1335.  However, because Double

Coin failed to rebut the presumption of de facto government control and, therefore, failed to qualify

for a separate rate, Commerce considered Double Coin to be part of the PRC-wide entity and

assigned the PRC-wide entity a revised margin of 105.31 percent that was calculated by averaging

the existing entity rate of 210.48 percent with Double Coin's margin of 0.14 percent.  Id.  The

Court remanded the proceeding, holding that 19 U.S.C. § 1677f-1(c)(1) required Commerce to

apply to Double Coin an individual weighted-average marking of 0.14 percent.   Id. at 1342.

Commerce asserts that the instant case is distinguishable in that the agency did not calculate a

margin for Rongxin based on verified sales information, and did not revise the PRC-wide entity

rate.  Second Remand Results at 24.

     Rongxin and Dixon filed their comments on the Second Remand Results on June 19, 2017.

Pl.'s Comments on Remand Results ("Pl.'s Br."), ECF Nos. 90–91; Def.-Inter.'s Comments on

Remand Results, ECF No. 92.  The Government filed its reply on July 31, 2017.  Def.'s Reply to

Comments on Remand Results, ECF Nos. 93–94.

     On September 7, 2017, the Court stayed further proceedings in this case pending resolution

by the United States Court of Appeals for the Federal Circuit in Yantai CMC Bearing Co. Ltd. v.

United States, CAFC Appeal No. 2017-1885.  ECF No. 98.  Subsequently, Yantai CMC Bearing

Co. Ltd. voluntarily dismissed its appeal pending before the Federal Circuit.  Yantai, No. 2017-

1885, ECF No. 44-1.  The Court thus lifted the stay, and on April 3, 2018 instructed parties to

submit supplemental memoranda identifying the remaining issues in this case.  All parties filed

their supplemental memoranda on May 4.  Pl.'s Resp. to Court's Order, ECF No. 106; Def.'s Resp.

to Court's Order, ECF Nos. 104–05; Def.-Inter.'s Resp. to Court's Order, ECF Nos. 102–03.

     Oral argument was held before the Court on August 14, 2018.  ECF No. 112.

## JURISDICTION AND STANDARD OF REVIEW

     The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1581(c).  The Court

sustains Commerce's antidumping determinations, findings, and conclusions unless they are

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also

reviewed for compliance with the court's remand order."  Beijing Tianhai Indus. Co. v. United

States, 39 CIT ___, ___, 106 F. Supp. 3d 1342, 1346 (2015) (citation omitted).

## DISCUSSION

### I.      Commerce Complied With The Court's Remand Order.

In <u>Rongxin II</u>, the Court remanded this case "for further determination regarding consideration of the other criteria, as well as a determination of the ultimate calculus, including the impact of the criterion regarding autonomous selection of management." 203 F. Supp. 3d at 1348.  The Court explained that it was expressing no view as to whether entitlement to a separate rate is to be determined under a totality of the circumstances, whether a respondent must satisfy each of the four criteria, or whether the failure to establish autonomy from the government in the selection of management, or a finding of lack of such autonomy, can alone justify denial of a separate rate, even when there is evidence supportive of the exporter offered with respect to the other criteria. <u>Id.</u> at 1348–49.  The Court noted that the issues "may be addressed on remand." <u>Id.</u> at 1349.  Rongxin argues that, contrary to the Court's order, Commerce in the <u>Second Remand Results</u> continued to rely only on the selection of management criterion in determining that Rongxin is under de facto control by the PRC government.  Pl.'s Br. at 2.

Rongxin is incorrect, and its argument is unpersuasive.  Commerce's emphasis throughout the <u>Second Remand Results</u> on its position that a respondent must affirmatively demonstrate each criterion of the de facto control analysis in order to show autonomy is in line with the element of the Court's remand ordering "a determination of the ultimate calculus, including the impact of the criterion regarding autonomous selection of management." <u>Rongxin II</u>, 203 F. Supp. 3d at 1348. Though Commerce explicitly premised its conclusion upon the selection of management criterion, the agency also stated that, "in an effort to comply with the Court's remand order, and in light of Rongxin's claims that record information rebuts the presumption of government control," it reviewed whether Rongxin established an absence of de facto government control with respect to

the other three criteria.  Second Remand Results at 20.  Even Rongxin, for its part, acknowledges

in its brief that Commerce analyzed the other three prongs of the de facto control analysis.  Pl.'s

Br. at 5–7.  Commerce thus complied with the Court's remand order from Rongxin II.

## II.  Commerce's Determination Is Supported By Substantial Evidence.

As noted, Commerce continued to find that Rongxin failed to demonstrate de facto

autonomy from government control "based on the Chinese government's exercise, or potential to

exercise, control over the company's operations via the SASAC's indirect majority ownership of

Rongxin, as well as evidence that Rongxin does not operate autonomously from government

control in the selection of its management."  Second Remand Results at 24.  In response to

Rongxin's comments on the draft of the Second Remand Results, Commerce reviewed Rongxin's

evidentiary submissions regarding the other three de facto control analysis criteria, and concluded

that Rongxin did not demonstrate an absence of government control with respect to them.

Noting Commerce's reference to Yantai, Second Remand Results at 15–22, Rongxin

contends that case is not sufficiently similar to the instant case to be dispositive.  Pl.'s Br. at 2–4.

Rongxin substantially restates its position, presented in the prior phase of litigation before this

Court, that Commerce unreasonably concluded that Rongxin has not demonstrated independence

of the PRC government in its selection of management, which is one of the four de facto control

criteria.  Id.; see Rongxin II, 203 F. Supp. 3d. at 1346–50.

Substantial evidence is "more than a mere scintilla," but "less than the weight of the

evidence."  Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004).  "A finding is

supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to

support the finding."  Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017)

(citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).  "The substantiality of

evidence must take into account whatever in the record fairly detracts from its weight." CS Wind

Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016).  As explained above, the

absence of de facto government control can be shown by evidence that the exporter: (1) sets its

prices independently of the government and of other exporters, (2) negotiates its own contracts,

(3) selects its management autonomously, and (4) keeps the proceeds of its sales (taxation aside).

AMS Assocs., 719 F.3d at 1379.  To be eligible for a separate rate, a company from a nonmarket

economy country must establish each of the four factors to rebut the presumption of government

control.  Yantai, 203 F. Supp. 3d at 1326.

Regardless of whether similarities between the facts in Yantai and this case support a

conclusion that Rongxin does not autonomously select management for analogous factual reasons,

the Court has already reviewed Commerce's analysis of Rongxin's Articles of Association and

sustained the agency's determination that Rongxin does not select its management autonomously

of the PRC government.  Rongxin II, 203 F. Supp. 3d. at 1349–50.  Because Commerce's

determination as to this prong of the de facto control analysis was reasonable and supported by

substantial evidence, id., and a respondent must demonstrate that it meets each criterion of the

analysis in order to be considered de facto independent of the government, Commerce's overall

determination that Rongxin has not established a lack of de facto control by the PRC government

is likewise reasonable and supported by substantial evidence.  See Yantai, 203 F. Supp. 3d 1317,

1326 ("Given that all four factors must be satisfied, Commerce had no further obligation to continue

with the analysis.").

As Commerce produced determinations regarding the remaining three de facto control

analysis criteria in accordance with the Court's remand order in Rongxin II, 203 F. Supp. 3d at

1348, the Court addresses those findings, and holds that they too are supported by substantial

evidence.  Again, these remaining three criteria require the exporter to demonstrate that it sets its

prices independently of the government and of other exporters; negotiates its own contracts; and keeps the proceeds of its sales (taxation aside).  Second Remand Results at 20–22; AMS Assocs., 719 F.3d at 1379.  Rongxin, though acknowledging that Commerce analyzed the three remaining prongs, asserts that the "analysis makes no sense."  Pl.'s Br. at 5.  First, regarding setting export prices, Rongxin argues that the Article 13.4 identified by Commerce merely discusses the company's accounting procedures as to budget and final revenue, and thus does not involve making sales or decisionmaking over such sales.  Id.  Second, regarding negotiation of contracts, Rongxin asserts that Commerce's citations to Articles 13.9 and 19.2 are inapposite, because those provisions explicitly refer to the Board's relationship with Rongxin's managing director, and not to the Board's influence on contract negotiation.  Pl.'s Br. at 5–6.  Third, regarding restrictions on export revenue and profits, Rongxin contends that Commerce's citations to Articles 13.4 and [[    ]] are inapposite, as those Articles refer merely to normal corporate governance and do not suggest a nexus to government control.  Id. at 6.

Rongxin's arguments are unpersuasive.  Commerce's finding that Article 13.4 speaks to the Board's control over pricing for subject merchandise, negotiation of contracts, and revenue is reflective of that Article's broad authorization of the Board's financial oversight abilities.  Further, it is consistent with Commerce's analysis of other Articles, such as 13.9 and 19.2, which dictate that the Board controls management, including the stationery manager who is in charge of price and contract negotiation.  Second Remand Results at 20–21.  Moreover, as Commerce explained, Article [[    ]] explicitly states the Board has authority to control profit distribution, while Article [[  ]] provides for dividend payment in proportion to investment in the company.  Id. at 21.  As the Court has stated, SITG -- which is wholly owned by the PRC-owned SASAC -- is the majority owner of Rongxin.  Relatedly, and of importance here, Rongxin fails to view Commerce's analysis

in light of Commerce's prior conclusion, already sustained by this Court, <u>Rongxin II</u>, 203 F. Supp.

3d. at 1349–50, that Rongxin does not select its management autonomously of the PRC

government because SITG has effective control over the Board.  Notably, the Court stated in

<u>Rongxin II</u>, 203 F. Supp. 3d at 1350, that "on its face, Article 13.9 does not limit the class of

managers appointed by the Board in the way Rongxin contends."  Further, "even if the stationery

manager were not appointed by the Board, given that SITG owns a majority of Rongxin's shares

and had the responsibility of electing the Board of Directors, Commerce reasonably determined

that SITG still had 'major input in the selection of Rongxin's management' under Article 13.3—

such that Rongxin does not have autonomy from the government in the selection of management."

<u>Id.</u>  Accordingly, Commerce's conclusion that, "[b]ecause SITG has effective control over the

Board, and SITG is wholly-owned by the SASAC, . . .  Rongxin is not free to set its prices or make

autonomous decisions regarding the negotiation of contracts," was reasonable and supported by

substantial record evidence.

**III.      <u>Commerce's Determination Is In Accordance With Law.</u>**

    Citing <u>China Mfrs. Alliance</u>, 205 F. Supp. 3d 1325, Rongxin argues that Commerce's

implementation of the de facto control analysis is a policy that impermissibly runs counter to the

statutory dictates of 19 U.S.C. § 1677f-1.  Pl.'s Br. at 7–9.  Specifically, Rongxin argues that,

because it is a mandatory respondent, "regardless [sic] whether Rongxin is absolutely controlled

by the government of China -- or completely independent -- it deserves a separate rate based on its

data."  Pl.'s Br. at 8.  Accordingly, Commerce's rebuttable presumption of state control for

exporters and producers in NME countries, and the resulting application of the country-wide entity

in the absence of affirmative demonstration of de facto and de jure independence from the

government, "is moot when it comes to mandatory respondents, since a policy can never outweigh a statute." Id.

Rongxin's argument that Commerce's policy contravenes the statute is unpersuasive. To determine whether Commerce's interpretation and application of the statute is in accordance with law, the Court considers whether "Congress has directly spoken to the precise question at issue." Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984). If so, the Court's inquiry ends, for it must "give effect to the unambiguously expressed intent of Congress." Id. at 843. If, however, the statute does not answer the question at hand because it is "silent or ambiguous," then the Court determines whether the agency provided "a permissible construction of the statute." Id. Commerce possesses "special expertise" in antidumping cases and the Court "accord[s] substantial deference to its construction of pertinent statutes." Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1351 (Fed. Cir. 2016) (quoting SKF USA Inc. v. United States, 254 F.3d 1022, 1028 (Fed. Cir. 2001)). The Court thus defers to Commerce's interpretation of its statute as long as that interpretation is reasonable. Kyocera Solar, Inc. v. United States Int'l Trade Comm'n, 844 F.3d 1334 (Fed. Cir. 2016). Put another way, where Commerce's methodology is challenged for accordance with law, "Commerce's decision will be set aside if it is arbitrary and capricious." Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States, 701 F.3d 1367, 1374 (Fed. Cir. 2012).

Once again, Commerce's policy is that the absence of de facto government control can be shown by evidence that the exporter: (1) sets its prices independently of the government and of other exporters, (2) negotiates its own contracts, (3) selects its management autonomously, and (4) keeps the proceeds of its sales (taxation aside). See AMS Assocs., 719 F.3d at 1379. The Court recognizes that the Federal Circuit has consistently, and recently, sustained Commerce's rebuttable

presumption of government control to exporters and producers in NME countries, including the

de facto control analysis, as a lawful exercise of its statutory discretion.  See Diamond Sawblades,

866 F.3d at 1311 ("If a company from the NME country rebuts the presumption by showing its

independence from state control, it can qualify for a separate rate; if the company fails to rebut the

presumption, however, it receives the single state-wide dumping rate."); see Changzhou Hawd

Flooring Co., Ltd. v. United States, 848 F.3d 1006, 1009 (Fed. Cir. 2017) (noting that Commerce

"presumes that each Chinese exporter and producer is state-controlled, and thus covered by a single

China-wide antidumping-duty rate, but a firm may rebut the presumption"); Changzhou Wujin

Fine Chem., 701 F.3d at 1370 (noting that an exporter or producer who fails to rebut the

presumption of state control receives "a single state-wide rate" but that the presumption is

rebuttable such that "a company that demonstrates sufficient independence from state control may

apply to Commerce for a separate rate").

Further, and at issue in this case, to be eligible for a separate rate, a company from an NME

country must establish each of the four factors to rebut the presumption of government control.

Yantai, 203 F. Supp. 3d at 1326.  As has been noted, in Yantai, the Court sustained Commerce's

determination that the respondent was ineligible for a separate rate because the respondent had

failed to satisfy the selection of management criterion of the de facto control analysis.  Id. at 1325–

26.  Yantai's sustenance of Commerce's position that a respondent must meet every criterion to

demonstrate de facto independence is consistent with the Court's prior remand order in this

proceeding.  In Rongxin II, 203 F. Supp. 3d. at 1349, the Court explicitly allowed Commerce on

remand to address whether the de facto control analysis requires the exporter to meet each of the

four criteria, or whether, for example, the analysis constituted a totality of the circumstances test.

Commerce has done so, reasonably and consistently explaining that it requires the satisfaction of

all four criteria in order to find de facto independence from the PRC government. <u>See generally</u>

<u>Second Remand Results</u>.   As explained above, the Federal Circuit has repeatedly and recently

affirmed that Commerce's separate rate analysis is a lawful exercise of its statutory discretion;

Commerce's position that the de facto control analysis element of the overall separate rate

determination requires satisfaction of all four factors is likewise reasonable and entitled to

deference from this Court.   Critically, Rongxin presents no compelling argument that this

methodology is unreasonable.   <u>See Huzhou Muyun Wood Co. v. United States</u>, No. 16-00245,

2018 WL 3455350, at *7 (Ct. Int'l Trade July 16, 2018), <u>as amended</u> (July 27, 2018).

Besides the lawfulness of Commerce's separate rate analysis being established, <u>China</u>

<u>Mfrs. Alliance</u> is not controlling here for several reasons.   As an initial matter, Rongxin did not

raise its argument against the lawfulness of Commerce's separate rate policy in its administrative

case brief before Commerce or in its motion for judgment on the agency record filed with this

Court.   <u>See Rongxin I</u>; <u>Rongxin II</u>.   "[A] litigant must diligently protect its rights in order to be

entitled to relief."   <u>Stanley Works (Langfang) Fastening Sys. Co. v. United States</u>, 41 CIT ___,

___, 279 F. Supp. 3d 1172, 1190 (2017) (quoting <u>JBF RAK LLC v. United States</u>, 790 F.3d 1358,

1367 (Fed. Cir. 2015)).   This Court shall require the exhaustion of administrative remedies "where

appropriate," 28 U.S.C. § 2637(d), and Commerce has provided by regulation that an

administrative case brief "must present all arguments that continue . . . to be relevant to the [] final

determination or results," 19 C.F.R. § 351.309(c)(2).   <u>See Sandvik Steel Co. v. United States</u>, 164

F.3d 596, 599 (Fed. Cir. 1998) ("It is 'a general rule that courts should not topple over

administrative decisions unless the administrative body not only has erred but has erred against

objection made at the time appropriate under its practice.'" (quoting <u>United States v. L.A. Tucker</u>

<u>Truck Lines, Inc.</u>, 344 U.S. 33, 37 (1952))).   Accordingly, this Court has recognized that under the

Federal Circuit's case law, arguments that are not raised in a party's opening brief, or that are raised in the first instance on remand, are generally waived. See Beijing Tianhai Indus. Co. v. United States, 41 CIT ___, ___, 234 F. Supp. 3d 1322, 1330 (2017) (quoting SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006)); Dorbest Ltd. v. United States, 604 F.3d 1363, 1375–76 (Fed. Cir. 2010) (regarding waiver of arguments first raised on remand).

Nor is Rongxin's contention saved by the fact that China Mfrs. Alliance was issued after this Court ordered remand in Rongxin II.[13]  Neither the statute nor Commerce's policy employing a rebuttable presumption of government control over export activities in NME countries has changed in any material sense.  Rongxin was capable of raising its present argument that Commerce's policy contravenes the statute and is unlawful at the initial stage of administrative proceedings, just as the plaintiff in China Mfrs. Alliance did.[14]  See Stanley Works, 279 F. Supp. 3d at 1190 ("[T]he question is whether the methodology is justifiable, and to resolve that issue, a factual record needs to be developed." (citing Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003) (determining that the pure legal question exception could not apply when the Court would have to assess Commerce's justifications for its practice))).  Moreover, China Mfrs. Alliance is a decision issued by this Court; it is not binding authority controlling the disposition of the instant case and would not have materially affected its result.  Gerber Food (Yunnan) Co. v. United States, 33 CIT 186, 196 (2009) (citing Algoma Steel Corp. v. United States, 865 F.2d 240, 243 (Fed. Cir. 1989)).

---

[13] China Mfrs. Alliance was issued on February 6, 2017.

[14] The plaintiff in China Mfrs. Alliance argued before Commerce that the agency "does not have the authority to apply a country-wide entity rate that meets neither the statutory requirements for an 'individually investigated' or 'all others' rate."  Certain New Pneumatic Off-the-Road Tires From the People's Republic of China, 80 Fed. Reg. 20,197 (Dep't Commerce Apr. 15, 2015) (final results) and accompanying IDM at 6.

The Court does, however, address the substance of Rongxin's contention that China Mfrs. Alliance should substantially control here, and finds it unpersuasive.  Importantly, the Federal Circuit has clarified that China Mfrs. Alliance should not be read to detract from its precedent consistently upholding Commerce's use of the PRC-wide entity rate for companies that fail to rebut the presumption of government control, or to question the underlying NME presumption of the separate rate analysis.  Diamond Sawblades, 866 F.3d at 1313 n.6.  In any event, and quite apart from the fact that it is not binding on this Court, China Mfrs. Alliance, see supra p.14, is distinguishable from the instant case.  As Commerce correctly points out in the Second Remand Results at 23–24, in the instant proceeding, the agency did not calculate a margin for Rongxin based on verified sales information, and did not revise the PRC-wide entity rate.  There was, therefore, no individual weighted-average to assign Rongxin, which Commerce also determined had not demonstrated an absence of de facto or de jure control by the PRC government.  Thus, Rongxin received, and continues to receive, the PRC-wide entity rate of 114.90 percent.  Id. at 24–25.

## CONCLUSION

For the foregoing reasons, Commerce's Second Remand Results are supported by substantial evidence and in accordance with law.  They are therefore sustained in their entirety.

**SO ORDERED.**

                                                                    /s/    Gary S. Katzmann
                                                                              Judge


Dated:  August 29, 2018
            New York, New York